(No. 77-CC-1114—▮▮▮▮▮▮▮

HOEL-STEFFEN CONSTRUCTION COMPANY, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed June 25, 1982.*

MOSER, MARSELAK, CARPENTER, CLEARY, JAECKEL, KEANEY & BROWN (RUSSELL F. WATTERS, of counsel), for Claimant.

TYRONE C. FAHNER, Attorney General (WILLIAM E. WEBBER, Assistant Attorney General, of counsel), for Respondent.

ROE, C. J.

This claim arises from a contract between Hoel-Steffen Construction Co., Claimant, and the Illinois Capital Development Board. Claimant is a corporation engaged in the business of constructing various types of commercial buildings as a general contractor. On February 15, 1974, Claimant entered into a contract with the Capital Development Board (CDB) to construct a one-story building at the Wabash Valley College in Mt. Carmel, Illinois. Prior to the entering of this agreement, the CDB furnished several documents to Hoel-Steffen Construction Co. upon which Hoel-Steffen was to base its bid. The differences of interpretation of these documents, which make up part of the contract agreement, is the basis of the dispute.

Most of the claim is based on several instances in which Claimant says it was authorized by the CDB to do extra work not included in the original contract. Claimant charges that it has performed the work and has not been compensated. Respondent argues that all of the work done by Claimant was either contained in the original contract price or performed without authorization. There is no dispute as to the quality of the work.

Originally CDB furnished Claimant with specifications, supplemental drawing details and two addenda and actual architectural drawings for the project so as to make its bid. The two addenda clarified parts of the drawings and specifications. Also submitted as part of the contractual documents was a document entitled "General Supplementary Conditions of the Contract for Construction." This is a standard form prepared by the American Institute of Architects and generally defines in contract terms the rights and obligations of all parties. It further provides that the contract documents consist of "the agreement, the Conditions of the Contract (General, Supplementary and other Conditions), the drawings, the Specifications, all Addenda issued prior to execution of the contract, and all Modifications thereto."

## I

On August 6, 1975, architects issued to Claimant a field order directing Claimant to do two items of extra work. The second item on the order directed Claimant to provide adapter frames for light fixtures in a certain area so as to accommodate existing fixtures at the job. The whole field order was "subject to an equitable adjustment in the contract amount and/or performance." Claimant was paid for the first item but not for the adapters. Claimant states that the adapters became necessary to correct an error in the shop drawings. According to Mr. Williams, vice president of Claimant, the original light fixtures did not fit into the ceiling design because of a lack of coordination between the architect and the prime electrical contractor and therefore the adapters had to be installed. Claimant argues that the error was caused by negligence on the part of the architect.

It is the generally accepted rule of law that the rights and obligations of the parties to a contract are determined

from the plain, unambiguous wording of the contract. (*Touhy v. Twentieth Century-Fox Film Corp.* (1969), 69 Ill. App. 3d 508, 387 N.E.2d 862.) Sections 4.13.3 and 4.13.4 of the General and Supplementary Conditions state:

"By approving and submitting shop drawings and samples the (claimant) therefore represents that he has determined and verified all field measurement, field construction criteria, materials, catalong numbers and similar data or will do so, and that he has *checked* and *coordinated* each shop drawing and sample with the requirements of the work and contract documents." (Emphasis added)

Furthermore, section 4.13.5 provides that, "The Architect will review and approve shop drawings and samples . . . only for conformance with the design concept of the project with the information given in the Contract Documents. The Architect's approval of a separate item *shall not indicate approval of an assembly in which the items function.*" (Emphasis added). The shop drawings which contained a description of the light fixtures were approved by Claimant, and it was therefore the responsibility of Claimant to coordinate these fixtures with the type of ceiling. Mr. Williams testified that it was his understanding the parties had orally agreed that the architect had the final responsibility. However, there is no evidence to support this. In fact, Respondent's refusal to pay for the adapters after it had paid for the first item in the field order indicates such a lack of agreement. No oral modification of the clear terms of a contract will be valid without the consent of both parties to the contract. *Hulcher v. Adcock* (1960), 25 Ill. App. 2d 255, 166 N.E.2d 168; *Faith v. Martoccio* (1974), 21 Ill. App. 3d 999, 316 N.E.2d 164.

## II

The second area of dispute concerns $4,400.00 worth of expenses incurred by Claimant for plumbing work

five feet outside the building lines. The confusion arose because of an addendum sent from the CDB to Claimant before the actual bids were submitted. The addendum states that the plumbing and fire protection work had already been bid, that the low bidder for the plumbing and fire protection work was H & H Plumbing and that the bid was $65,356.00. A notation following states:

"H & H Plumbing price includes $7,800.00 for plumbing and fire protection work 5'00" outside of the building lines. *This work is under the General Construction contract as stated in the Site Utilities §02550.* H & H mistakingly (sic) included this in their base price."

Respondent asks us to read only the underlined portion of the statement. However, the addendum must be read in its entirety and in the context in which it occurs.

According to Mr. Williams, the purpose of an addendum as it is commonly used in the construction industry is to inform the general contractor, before he submits his final bid, as to additions or deletions in the contract. Before Claimant received this addendum, it was prepared to submit a bid which included the plumbing work five feet outside the building lines. After it received the addendum, Claimant assumed that this was to inform Claimant of a deletion. Had Respondent not sent the addendum, Claimant clearly would have submitted a bid sufficient to include this work. Respondent argues that Claimant should have written into its bid that it was deleting section 02550. While this would have clarified matters, the initial confusion was caused by Respondent. If Respondent had simply indicated that section 02550 is still under the general construction contract and should be bid, or that $7,800.00 should be deducted from H & H Plumbing's bid for work five feet outside the building lines, there would have been no confusion. The contract and addendum were prepared by Respondent, and any ambiguities are to be construed

against Respondent. *Epstein v. Yoder* (1979), 72 Ill. App. 3d 966, 391 N.E.2d 267.

Respondent also argues that it should not be required to pay Claimant since it has already paid H & H Plumbing $7,800.00 for the same work. This argument is inconsistent with Respondent's position. If Respondent believed that section 02550 was under the general contractor's responsibility, it should not have paid H & H Plumbing $7,800.00 for work not in H & H's contract, nor should it have directed Claimant to do the work. However, Claimant was directed by CDB to perform the site work. Claimant subcontracted this work to H & H Plumbing, although Claimant protested at the time to CDB that it was not required to do so under the contract documents. Claimant paid H & H Plumbing $4,000.00 for this work, and under the contract terms is entitled to a 10% general contractor's fee. The claim of $4,400.00 should be allowed.

### III

The third area of dispute is compensation for enclosing two plenum chambers. Claimant argues that there was no note detailing its responsibility to drywall the two plenum chambers. However, the contract specifically states "the general contractor is to provide the gypsum wall board as shown on the *drawings* and specified herein . . .". Shop drawing M-3 clearly provides for the gypsum drywall in the plenum chambers.

Mr. Phillips, an employee of the drywall subcontractor, testified that he did not include in his bid for subcontract work any provision for the two plenum chambers. He reviewed the specifications and found no reference to plenum chambers. The reference to such plenum chambers was contained in the mechanical drawings. Phillips stated that he did not review the mechanical drawings because "normally . . . we just don't get involved

in them unless there is something specifically noted someplace in the specifications or within the architectural plans." There was no such notation. The general contractor is responsible to make certain its subcontractors are given all information necessary to do their work. The failure of this subcontractor to receive information as to the enclosure of the plenum chambers with drywall is clearly the fault of Claimant. This portion of the claim should be denied.

. . .

## V

The fifth item of dispute involves a 5% general contractor's fee on the amount of a field order revision. There is no dispute that Claimant is entitled to its 5% fee. The dispute is over the correct amount of the field order work. The only evidence on this was the testimony of Claimant's vice president that the final bid by the plumbing contractor was $5,381.65 and that this was accepted by CDB. No other evidence was presented that any other figure was reached. Claimant should therefore be awarded its 5% fee, or $269.08.

## VI

The final portion of Claimant's claim is for $204.14. This represents expenses incurred by Claimant when it attempted to submit the above disputes to arbitration with the American Arbitration Association. The contract contains a provision that any disputes arising from the contract be submitted to binding arbitration. Respondent moved to dismiss the arbitration on the grounds that by statute it cannot be bound by an arbitration provision. This motion was apparently allowed because the arbitrator determined he could not proceed without the consent of both parties.

The Illinois legislature has adopted the Uniform

Arbitration Act (Ill. Rev. Stat., ch. 10, par. 101 *et seq.*). The purpose of the Act is to discourage litigation and foster voluntary resolution of disputes through arbitration without the strict formalities of court proceedings. (*Flood v. Country Mutual Insurance Co.* (1967), 89 Ill. App. 2d 358, 232 N.E.2d 32; *Wilhelm v. Universal Underwriters Insurance Co.* (1978), 60 Ill. App. 3d 894, 377 N.E.2d 62.) The Act authorizes the circuit courts of this State to enforce any arbitration agreement and to enter judgment on an arbitration award. Ill. Rev. Stat., ch. 10, par. 116.

On the other hand, the legislature has granted exclusive jurisdiction to the Court of Claims to determine "all claims against the state founded upon any contract entered into with the State of Illinois." (Ill. Rev. Stat., ch. 37, par. 439.8.) This is a response to article 13, section 4 of the Illinois Constitution of 1970, which provides that sovereign immunity is abolished in Illinois, "except as the General Assembly may provide by law." The General Assembly has provided that the State may not be made a party defendant or party in any court except as is provided in the Court of Claims Act (Ill. Rev. Stat., ch. 37, par. 439.1 *et seq.*). If the Uniform Arbitration Act were to apply to the State, then that Act would authorize suits in the circuit courts against the State either to enforce the provision to arbitrate or to enter judgment on an award. Since such action is precluded by the Constitution and by "An Act in relation to immunity for the State of Illinois" (Ill. Rev. Stat. 1977, ch. 127, par. 801), it is obvious that the legislature did not intend to allow the State to bind itself to arbitration through the Uniform Arbitration Act. Respondent therefore had the right to refuse to arbitrate, and this portion of the claim should be denied.

In summary the following is our disposition of the various elements of this claim:

1. Adapter frames for light fixtures ........ denied;

2. Plumbing work ............ $4,400.00 awarded;

3. Plenum chambers ..................... denied;

4. Stainless steel counter top ..... $605.00 awarded;

5. 5% general contractor's fee .... $269.08 awarded;

6. Arbitration expenses .................. denied;

So ordered.